# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **CARMEN LLERENA DIAZ,** ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Civil Action No. 08cv10143-NG** |
| ) | |
| **JITEN HOTEL MANAGEMENT, INC.,** ) | |
| **Defendant.** ) | |

GERTNER, D.J.:

## MEMORANDUM AND ORDER RE: MOTION FOR SUMMARY JUDGMENT
January 20, 2011

## I.    INTRODUCTION

Ms. Carmen Llerena Diaz ("Diaz") brought an age-discrimination action under 29 U.S.C. §§ 621-634 and M.G.L. c. 151B against her former employer, Jiten Hotel Management ("Jiten") for their actions during her years as the head housekeeper at the Holiday Inn Express. She alleges the workplace was fraught with age discrimination -- abusive conduct and offensive ageist comments to her and others -- so as to constitute a hostile environment; and that she suffered disparate treatment and the intentional infliction of emotional distress when she was suddenly denied review and annual raises and then terminated after more than twenty years of service.[1] The matter is presently before this Court on the Defendant's Motion for Summary Judgment (document # 63).

Specifically, the plaintiff alleges that after twenty-two years of excellent service and two "Department Head of the Year" awards, she was suddenly denied review and the corresponding

---

[1] There is some confusion as to whether the plaintiff has dropped claims regarding her termination. She voluntarily dismissed Count IV of her Amended Complaint for Wrongful Termination. It is my understanding that she thereby withdrew her *common law* claim for wrongful termination but not her statutory claims. She has not withdrawn Counts I and II, which allege, *inter alia*, that she suffered age discrimination under 29 U.S.C. § 621-634 and M.G.L. c. 151B § 4 when she was terminated on account of her age. I will not amend those Counts to exclude her termination without an express motion by the plaintiff -- particularly given the financial implications for damages in a discrimination suit.

annual raises.  Her direct manager, Mitesh Patel ("Mitesh")[2] repeatedly asked her when she was going to retire, told her that she was getting old, and indeed called her an "old pumpkin," an "old shoe," and an "old hankie."  When she hired a 52-year old laundry attendant, he told her, "You're going to convert this hotel into a nursing home."  The harassment, she alleges, permeated the environment.  Indeed, another manager told her that management thought she was too old for the job and that "old people should remain home."

Diaz filed a complaint with the Equal Employment and Opportunity Commission ("EEOC") and Massachusetts Commission Against Discrimination ("MCAD") on August 4, 2006.

The defendant moves for summary judgment primarily on two grounds.  First, it argues that whatever claims Diaz has are directed solely against Mitesh, her direct manager.  And, since Mitesh was transferred from the hotel 315 days before Diaz filed her EEOC and MCAD claims (although he was employed at another hotel owned by the defendant), the statute of limitations of 300 days has expired.  Second, it would dismiss Mitesh's discriminatory statements as merely "stray remarks," certainly not indicative of his discriminatory animus or the employment environment as a whole.  And without Mitesh, defendant argues, Diaz's claims do not even meet the minimal prima facie standard.

I fundamentally disagree.  As I describe below, discrimination is a complex phenomenon, in general, and in particular, in the case at bar.  It is about concepts like bias and motivation,

---

[2] During her time under Jiten Hotel Management, Diaz reported to two subsequent managers, Mitesh Patel and Chet Patel, who are related.  I will refer to them by their first names for clarity.

precisely the kinds of concepts least suited for resolution by a judge.[3]  And the evidence that

bears on bias and motivation is rarely direct; few decisionmakers will say, for example:  I am

firing you because you are old (or a woman, or a minority).  Rather, discrimination must be

inferred not only from the statements of the relevant actors, but also from the context in which

they were made, including the relationships between the various actors, the speaker and those

around him.

In order to argue for summary judgment in this case, the defendant reduces the work

environment to the words of a single man.  And it would trivialize that one man's statements

about older workers: They did not reflect his real animus to older workers, it argues.  They did

not create an atmosphere in which such comments were condoned.  They did not set an example

for others concerning how older workers ought be treated.  Finally, they claim that after this one

individual was transferred, things suddenly improved; virtually overnight, the workplace was

purged of bias.

In effect, what the defendant would have this Court do is to -- as one scholar describes it

-- "slice and dice" the complex phenomenon of discrimination into pieces, and evaluate each

piece out of the context of the whole, the real, lived employment environment.  See generally

Michael Zimmer, Slicing & Dicing of Individual Disparate Treatment Law, 61 La. L. Rev. 577

(2001).  See also Elizabeth M. Schneider, The Dangers of Summary Judgment: Gender and

Federal Civil Litigation, 59 Rutgers L. Rev. 705, 709 (2007).  The approach is not unusual; it is

---

[3] I am troubled by recent statistics that suggest that seventy percent of summary judgment motions in civil rights cases and seventy-three percent of summary judgment motions in employment discrimination cases are granted.  See Joe Cecil & George Cort, Federal Judicial Center, Estimates of Summary Judgment Activity in Fiscal Year 2006 (2007) (cited in Elizabeth M. Schneider, The Dangers of Summary Judgment: Gender and Federal Civil Litigation, 59 Rutgers L. Rev. 705, 709 n.22 (2007)).

easier to point the finger at the "rogue" actor than to the unconscious and not so unconscious workplace bias that his actions may reflect and encourage.[4]

Nowhere is this reductionist approach more clear than the defendant's characterization of Mitesh's tasteless comments as "stray remarks," comments that somehow do not matter in the calculus of discrimination. As I describe below, the "Stray Remarks Doctrine" derived from Justice O'Connor's concurrence in <u>Price Waterhouse v. Hopkins</u>, 490 U.S. 228, 276 (1989) (O'Connor, J., concurring), a gender discrimination case, under a mixed-motive theory, which was very different from the case at bar. And, in my judgment, the Doctrine has been distorted beyond recognition in the subsequent case law.

First, Diaz's claims *do not reduce* themselves to the statements of Mitesh. She describes comments made with others present, comments echoed by at least one other manager, creating, in effect, an atmosphere of impunity. And Mitesh's evaluations of her, arguably skewed by his bias, were credited by the employer even after he was transferred. Mitesh's departure does not trigger the end of the discrimination, at least on this record.

Second, Mitesh's comments should not be trivialized by characterizing them as merely "stray" remarks. In the past, judges understood the salience of biased comments, particularly

---

[4] As one scholar put it:

> One of the current problems in employment discrimination law is that courts view discrimination largely as a 'problem of errant or rogue individual discriminators acting contrary to organizational policy and interest.' . . . In some cases, the search for the rogue actor is appropriate; however, in others, the search for the rogue actor asks the wrong question about culpability. It ignores the fact that multi-tiered or group decisionmaking processes may make it difficult or impossible to locate intent within a particular person. . . . [It] disregards the ways that both formal and informal processes and policies within an organization shape the intentions and actions of its individual members, and the ways that the actions and intentions of the individual members shape the organization.

Sandra F. Sperino, <u>A Modern Theory of Direct Corporate Liability for Title VII</u>, 61 Ala. L. Rev. 773, 787-88 (2010).

when they were racist.  The Fourth Circuit in 1988, for example, considered whether offensive

statements using the word "nigger" should have been excluded at trial:

> The user of such terms intends only one thing: to degrade those
> whom he describes in the most offensive manner. General use of
> these words, though obviously not conclusive evidence that a
> particular decision was made with racial animus, is clearly relevant
> to determining whether it was. It would be ironic indeed to
> conclude that use of the language of prejudice is irrelevant in a
> civil rights suit. Racial slurs represent the conscious evocation of
> those stereotypical assumptions that once laid claim to the sanction
> of our laws. Such language is symbolic of the very attitudes that
> the civil rights statutes are intended to eradicate.

Mullen v. Princess Anne Volunteer Fire Co., Inc., 853 F.2d 1130 (4th Cir. 1988).

Consider Mullen in the instant setting:  If a manager makes an ageist remark, it could

well be a window on his soul, a reflection of his animus, or arguably, just a slip of the tongue

somehow unrelated to his "true" feelings.  If other managers were nearby, they could well have

dismissed the overheard comment as an aberration, or it could have created a new norm of

conduct for the company, an atmosphere of impunity.  The point is that the inference to be given

the remark should not be made by judges, particularly judges who have not heard the entire

story.

As described below, I **DENY** summary judgment on all claims save one.  I **GRANT**

summary judgment on Diaz's claim for intentional infliction of emotional distress (Count V)

because that claim is barred by the Workers Compensation Act, as the plaintiff has

acknowledged.  See Doe v. Purity Supreme, Inc., 422 Mass. 563, 564-65 (1996) (common law

claims relating to a rape committed by a manager during work hours are barred by the Worker's

Compensation Act.)

## II.    **BACKGROUND**

The facts are here presented in the light most favorable to the plaintiff, as I am obliged to do on the defendant's motion for summary judgment.  Fennell v. First Step Designs, Ltd., 83 F.3d 526, 534 (1st Cir. 1996).

Diaz, a sixty-one year old Hispanic woman, worked as a housekeeper in the same hotel building for twenty-two years.  She started there in 1982 and continued after Jiten Hotel Management purchased the hotel property in 1997.  The hotel is now called the Holiday Inn Express, located at 69 Boston Street in Dorchester, Massachusetts.  Pl.'s Am. Compl.¶ 6 (document #33).  At the time of the events in question, Diaz was the Executive Housekeeper, the head of her department.

For years, Diaz performed well.  She earned annual raises, positive written evaluations, and awards for "Department Head of the Year" in 2001 and 2003.  She was by all accounts an excellent employee.  Bleakney Dep. 38:12-16, Dec. 11, 2008, Def.'s Ex. I (document #66-4) (admitting Diaz's "stellar performance").  She received consistent positive verbal and written performance evaluations and two minor warnings in her twenty-two years at the hotel.  See Diaz Performance Evaluations, Pl.'s Ex. 21 (document #70-22).

In 2004, however, her situation changed.  She started noting changes in the way the General Manager of the Holiday Inn Express, Mitesh Patel, treated her.  He began to ask her when she was going to retire and told her that she was "getting old."  Diaz Dep. 49:13-24; 50:1-5; 51:21-24, Jan. 12, 2009, Pl.'s Ex. 11 (document #70-12).  That year, for the first time, Jiten Hotel Management did not evaluate her performance.  She states that when she inquired about

the irregularity, Mitesh replied, "You're making a lot of money. Thank me that you are working and making this money." Id. 26:22-24; 27:1-7.

Though Diaz did not ask again about her annual evaluation or raise, her relationship with Mitesh deteriorated during 2004 and 2005. According to Diaz, Mitesh criticized her decisions, belittled her, embarrassed her and was generally verbally and mentally abusive. Diaz Dep. 49-56, Jan. 30, 2009, Pl.'s Ex. 4 (document #70-5). In December of 2004, Diaz contacted the corporate Vice President of Jiten, Beth Scherer, to report Mitesh's conduct. Ms. Scherer held a meeting with Diaz and Mitesh and told them to "continue doing what you're doing." She sent Diaz flowers afterward but otherwise took no action. Id. 58:11-16; 60: 1-10.

After this report to Scherer, the relationship between Diaz and Mitesh soured further. In 2005, Mitesh told Diaz that she looked like an "old pumpkin" when she wore an orange coat to a birthday party at the office. Id. 73:21-24; 74:1-14. At other times, he said that she looked like "an old shoe" and an "old hankie." Diaz Dep. 32:7-11, Nov. 9, 2009, Pl.'s Ex. 2 (document #70-3). Mitesh reprimanded Diaz in front of her colleagues, told her to "shut up," gave her assignments and then chided her for doing them, and undermined her authority in the presence of her subordinates. Diaz Dep. 49-56; 61, Jan. 30, 2009, Pl.'s Ex. 4. He screamed at Diaz for any reason at any time but did not discipline younger colleagues in the same derogatory manner. He told one of her staff members, Dawn Fazio ("Fazio"), 31 years old at the time, that he would like to promote her to Diaz's position because Diaz was getting old and he did not know if she could perform the job anymore. Fazio Aff., Pl.'s Ex. 12 (document #70-13). (Fazio was an employee in the Housekeeping Department from July 2002 to January 2004.)

Mitesh's attitude towards older people was apparently not limited to Diaz. He complained about other older employees, too. For example, when Diaz hired a laundry attendant who was 52 years old, Mitesh told her, "You're going to turn this hotel into [a] nursing home." Diaz Dep. 78:20-24; 79: 1-6, Jan. 12, 2009, Pl.'s Ex. 11. Fazio also observed that Mitesh treated older staff members more harshly. He often referred to Houseman Rafael Betances ("Betances") (a man in his 50s) as an "old man." Fazio Aff., Pl.'s Ex. 12. Luz Perez, another colleague, stated that Mitesh would ridicule Betances because he could not lift a five-gallon container of laundry detergent and told him that he was "too old to do this job." Perez Aff., Pl.'s Ex. 13 (document #70-14).

Diaz alleges that Mitesh's behavior had a ripple effect; other managers and coworkers began to view her as too old. Another staff member, Oswaldo Lopez-Vanegas, has openly admitted to referring to Diaz as "old lady." Lopez Dep. 45:1-11, July 1, 2009, Pl.'s Ex. 16 (document #70-17). Ramon Suero, a colleague, testified that in July of 2006, he was asked to sign a written statement prepared by the Director of Sales, Daniela DePina, that referred to Diaz as a "lonely old lady." He signed the statement, including untrue facts, out of fear of losing his job. Suero Dep. 69-70, Dec. 15, 2008, Pl.'s Ex. 15 (document #70-16). In 2005, Diaz again did not receive a review or a raise.

Sometime between September 2005 and March of 2006, Mitesh was transferred to the Marriott Courtyard Hotel in Revere, Massachusetts, also managed by Jiten. Mitesh still spent a great deal of time at the Holiday Inn Express and remained involved in management decisions,

even after his transfer.  The exact date of his transfer and subsequent presence is in dispute.[5]  He

was replaced by his relative, Chet Patel ("Chet").[6]

Although Mitesh had left, Diaz's treatment continued.  In the winter of 2006, Director of

Sales Daniela DePina ("DePina") told her that "old people must remain home" and that

management saw Diaz as too old for the job.  Diaz Dep. 63:16-24; 64, Jan. 12, 2009, Pl.'s Ex. 11.

Ms. DePina also told Ramon Suero that management was planning to fire Diaz because she was

too old for the job.  See Maria Hernandez Dep. 50-52, Mar. 13, 2009, Pl.'s Ex. 14 (document

#70-15) (overhearing conversation).  By March of 2006, Diaz took a leave of absence and sought

counseling services for work-related anxiety.  Sometime after her return to work, in April 2006,

Diaz wrote a letter to Chet requesting a performance evaluation and annual raise.  She did not

receive a response.  See Letter from Carmen Diaz to Chet Patel, Apr. 27, 2006, Pl.'s Ex. 24

(document #70-25).  Subsequent conversations made clear that other employees had already

received their annual evaluations and raises.  On July 27, 2006, Diaz asked again, and Chet

replied that he would check with Human Resources.  When pressed the next day, he said that he

had not yet heard from the department.  Diaz heard nothing more.  Pl.'s Am. Compl. ¶¶ 16, 17.

Jiten Hotel Management counters that it had a pay raise freeze during 2004, 2005 and

2006.  See Def.'s Mot. Summ. J. 13 (document #64).  And yet the company's own records reveal

that every manager other than Diaz -- all but one of whom were under the age of 40 -- received

at least one raise during this period.[7]  See Def.'s Ans. Interrog. (document #70-8) (listing pay

---

[5] On July 31, 2006, however, he did participate in the onsite investigation involving Carmen Diaz and
requested that Director of Sales Daniela DePina write a letter regarding her observations of Diaz.  Depina Dep. 15-
16, Dec. 9, 2008, Pl.'s Ex. 5 (document #70-6).

[6] Mitesh and Chet are both related to the owner of the Holiday Inn Express, Nyan Patel.  Pl.'s St. Facts ¶ 15.

[7] James Krusky was 45 years old.

raises for James Krusky, Jeanne MacGilvray, Mitesh Patel, William Scherer, Marco Castillo, Denise Brown, Elvin Pimental, Daniela Depina, Maria Elena Lopez, and Chetan Patel).

On August 1, 2006, Diaz was fired. She was brought into a private meeting with Assistant General Manager James Krusky and Chet Patel and told that she was terminated. They said that the corporate office received an anonymous letter alleging that Diaz made discriminatory remarks against African Americans, employees, and guests of the hotel. Apparently an investigation had taken place on her day off, July 31, 2010. Diaz was not interviewed as part of this investigation. Elena Bardales, a younger employee who earned a lower salary than Diaz, then assumed her position.[8] Pl.'s Am. Compl. ¶ 20.

On August 7, 2006, Diaz filed EEOC and MCAD complaints. Shortly thereafter, three employees allegedly wrote letters stating that Diaz discriminated against hotel employees and guests. These letters were unsigned, typed in the same format, and all dated August 24, 2006 -- *after* Diaz was terminated. See letters from Dulce Santos, Daniela DePina, and Ramon Suero "to whom it may concern" (document #66-7). Ramon Suero testified that management brought him a letter to sign that alleged that Diaz had made racial slurs. He states that this letter was not true and that he signed it out of fear of losing his job. Suero Dep. 69-70, Dec. 15, 2008, Pl.'s Ex. 15.

The EEOC dismissed Diaz's claim in November 2007.[9]

---

[8] Bardeles was later replaced with an older employee. Pl.'s Am. Compl. ¶ 21. The details or timing of this appointment have not been provided to the Court.

[9] This Court was not provided with an opinion by the EEOC and is therefore unaware of the grounds for dismissal.

## III. STANDARD OF REVIEW

Summary judgment is appropriate only when all of the pleadings and supporting documents, viewed in a light most favorable to the non-moving party, present no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).

Discrimination cases necessarily involve allegations of intent, motive, bias, and ill sentiment. Both parties introduce circumstantial evidence -- to prove discrimination that boils underneath the surface at a workplace -- or to prove the lack thereof. See Ruffino v. State Street Bank & Trust Co., 908 F.Supp. 1019, 1028 (D. Mass. 1995). These factually wrought disputes are the least-suited for summary judgment. Indeed, the First Circuit has warned that "courts should exercise particular caution before granting summary judgment for employers on such issues as pretext, motive, and intent." Santiago-Ramos v. Centennial P.R. Wireless Corp., 217 F. 3d 46, 54 (1st Cir. 2000). Nonetheless, even in cases involving motive and intent, summary judgment "may be appropriate if the nonmoving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation." Medina-Munoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir.1990).

## IV. ANALYSIS

The defendant brings two arguments in favor of summary judgment on Diaz's age discrimination claims: (I) the statute of limitations has expired because Mitesh, her direct supervisor, left the company 315 days before she filed her EEOC and MCAD claims -- requiring that I find Diaz's discrimination claims somehow reduce themselves to his actions and his alone;

and (ii) in any event, Diaz cannot make out a prima facie case for age discrimination beyond her supervisor's "stray" comments.

As described above, this is a familiar argument. Defendant would have me pick the one person whom they claim was solely responsible for the discrimination, determine when he left, and conclude that discrimination ended with his transfer. And, even as to *his* behavior, take the words out of context and call them merely "stray."[10] See generally Michael Zimmer, Slicing & Dicing of Individual Disparate Treatment Law, 61 La. L. Rev. 577 (2001). The Supreme Court has warned, however, that I must also bear in mind the broader narrative at play in a discrimination case, the context in which discrimination plays out. I am to consider *all* the evidence, even as I evaluate each piece. See Reeves v. Sanderson Plumbing Prod., Inc., 530 U.S. 133, 150 (2000) (finding that the Court of Appeals "impermissibly substituted its judgment concerning the weight of the evidence for the jury's" and failed to consider *all* of the evidence in the record most favorable to the plaintiff).[11] I will do so here.

A.     Statute of Limitations

Title VII and Chapter 151B require plaintiffs to file claims with the EEOC and the MCAD before filing suit in court and within 300 days of complained acts of discrimination. 42 U.S.C. § 2000e-5(e); M.G.L. c. 151B, § 5. As a general rule, the limited filing period required by Title VII and Chapter 151B is meant to be "interpreted broadly to give effect to the state and

_____

[10] It is interesting to note how many times the words "stray remarks" are linked to the adjective "merely," in the case law. Plainly, defendants (with court approval) are trivializing remarks that are arguably biased, suggesting that they somehow do not count in evaluating human behavior in the workplace. Clearly they "count." They are part of the data a decisionmaker evaluates in identifying discrimination.

[11] This approach is all the more important in the light of the findings of social psychology, cognitive psychology, and cognitive neuroscience concerning "implicit social cognition," the mental processes that affect social judgments, including discriminatory judgments, but operate without conscious awareness. See Jerry Kang and Kristin Lane, Seeing through Colorblindness: Implicit Bias and the Law, 58 UCLA L. Rev. 465, 468 (2010).

federal laws' broad remedial purposes." <u>Ruffino</u>, 908 F. Supp. at 1037.  Indeed, conduct outside the statutory period may be encompassed in a discrimination claim, so long as some unlawful conduct occurred within the statutory window.  <u>See, e.g.</u>, <u>Nat'l R.R. Passenger Corp. v. Morgan</u>, 536 U.S. 101, 117 (2002).

There are two kinds of continuing violations: serial violations and systemic violations.  A plaintiff may bring a charge for serial violations where the defendant violates her rights over and over again in separate instances.  To establish a serial violation in Massachusetts, a plaintiff must prove that, "(1) at least one discriminatory act occurred within the limitations period, (2) the alleged timely discriminatory act has a substantial relationship to the alleged untimely discriminatory act, and (3) the otherwise time-barred events did not trigger his 'awareness and duty' to assert his rights."  <u>Windross v. Barton Prot. Serv., Inc.</u>, 586 F.3d 98, 103 (1st Cir. 2009) (applying Massachusetts law and citing <u>Ocean Spray Cranberries, Inc. v. Mass. Com'n Against Discrimination</u>, 441 Mass. 632, 642-43 (2004)).  The federal rule is even more forgiving.  Congress recently enacted the Lilly Ledbetter Fair Pay Act (FPA) to cover serial violations that relate to compensation decisions, including raises.[12]  Under the FPA, a claim accrues with each

---

[12] The Lilly Ledbetter Fair Pay Act of 2009, applies to "all claims of discrimination in compensation under title VII of the Civil Rights Act of 1964 (42 U.S.C. 2000e et seq.), the Age Discrimination in Employment Act of 1967 (29 U.S.C. 621 et seq.), title I and section 503 of the Americans with Disabilities Act of 1990, and sections 501 and 504 of the Rehabilitation Act of 1973" that are "pending on or after May 28, 2007."  Pub.L. No. 111-2, § 6 (2009).  The FPA amended the ADEA's statute of limitations:

> For purposes of this section, an unlawful practice occurs, with respect to discrimination in compensation in violation of this Act, when a discriminatory compensation decision or other practice is adopted, when a person becomes subject to a discriminatory compensation decision or other practice, or when a person is affected by application of a discriminatory compensation decision or other practice, *including each time wages, benefits, or other compensation is paid, resulting in whole or in part from such a decision or other practice.*

Pub.L. No. 111-2, § 4(3) (2009) (emphasis added).  In other words, the clock does not begin to tick when the compensation decision is made, but rather each time the employee is paid after that decision.  <u>Noel v. Boeing Co.</u>,

paycheck that stems from a discriminatory decision irrespective of when the decision was made.

See Noel, 622 F.3d at 272 ("[P]ursuant to the FPA, each paycheck that stems from a

discriminatory compensation decision or pay structure is a tainted, independent

employment-action that commences the administrative statute of limitations."); Almond v.

Unified Sch. Dist., No. 07-4064, 2010 WL 4384206, *8 (D. Kan. 2010) (explaining the history

and scope of the FPA).

Where, however, the plaintiff alleges a systemic violation, such as hostile work

environment, she need only show that "an act contributing to that hostile work environment takes

place within the statutory window." Morgan, 536 U.S. at 105 (noting that "a hostile work

environment claim is comprised of a series of separate acts that collectively constitute one

'unlawful employment practice'"). See also Sabree v. United Broth. of Carpenters & Joiners

Local No. 33, 921 F.2d 396, 400 n.7 (1st Cir. 1990). The plaintiff has alleged both types of

claims, systemic and serial.

The defendant argues that since Diaz's claims of discrimination are based exclusively on

the conduct of her supervisor, Mitesh, and since he was transferred on September 26, 2005, 315

days before she filed her claims with the MCAD on August 7, 2006, all of her claims are barred.

But the evidence cannot be parsed so cleanly. Factual disputes remain as to when Mitesh was

actually transferred, his close relationship to the decisionmakers that remained and the

continuing impact of his arguably biased evaluations on Diaz's subsequent firing. After all,

---

622 F.3d 266, 272 (3d Cir. 2010).

Courts have held that the denial of a raise is a compensation decision that invokes the FPA. See, e.g., Mikula v. Allegheny, 583 F.3d 181, 186 (3d Cir. 2009). In this case, Diaz's federal age discrimination claims for disparate treatment directly involve compensation and were pending before the EEOC on the onset date of the legislation in May of 2007. I will therefore apply the FPA rule that the 300 day statute of limitations began to accrue with each paycheck.

Mitesh continued to be employed by the same company, maintained friends with the managers, and even had an ongoing physical presence at the hotel. See Hernandez Aff. (document #70-4); Chetan Patel Dep. 17-19, Feb. 19, 2009, Def.'s Ex. K (document #66-13). Indeed, there is even evidence to suggest that Patel directly participated in Diaz's investigation and termination, long after his transfer.

Even if Mitesh had left his employment, however, Diaz's discrimination claim would still survive. In focusing exclusively on the whereabouts of Mitesh, the defendant asks this Court to ignore the broader context of the workplace. The argument suggests that one bad manager can come into a position, discriminate against a subset of employees, and then leave, without continuing to affect the workplace as a whole. In effect, thirteen days after his departure the company is purged and bias-free. It assumes, for example, that the manager did not represent or give voice to an underlying bias at the company. It assumes that no one -- subordinates or management -- overheard Mitesh's comments and ratified them, that Mitesh's bias towards and degradation of Diaz did not affect how others saw Diaz. These are all facts to be *determined*, not *assumed*.

Consider the conduct that is alleged to have occurred *during the statutory window (October 11, 2005 -- August 7, 2006)*, not involving Mitesh:

1. Colleague Oswaldo Lopez openly admitted to referring to Diaz as "old lady" in 2005 and 2006. Lopez Dep. 45 (document #70-3).

2. In the winter of 2006, another manager, Daniela DePina, told her that "old people must remain home" and that management saw Diaz as too old for the job. Hernandez Dep. 50-52 (document #70-15).

3. In April 2006, Diaz wrote a letter to Chet Patel, Jiten Hotel's Manager (and a relative of Mitesh Patel) requesting a performance evaluation and annual raise. She was not evaluated during 2006, nor did management

offer any explanation.  On July 27, 2006, Diaz asked again about her letter, and Chet Patel replied that he would check with Human Resources.  When pressed the next day, he said that he had not yet heard from the department.  Diaz heard nothing more.  Pl.'s Am. Compl. ¶¶ 16, 17.

4.      Diaz did not receive a raise in 2006.  Id.

5.      Ramon Suero, a colleague, testified that in July of 2006, he was asked to sign a written statement prepared by Ms. DePina that referred to Diaz as a "lonely old lady."  He signed the statement, including untrue facts alleging that Diaz used racial slurs, out of fear of losing his job.  Suero Dep. 69-70, Dec. 15, 2008, Pl.'s Ex. 15.

6.      After an anonymous letter complaining of alleged racial statements -- which Diaz plausibly alleges was fabricated -- the hotel conducted an "investigation" without her knowledge or participation and subsequently fired her after on August 1, 2006.  Pl.'s Am. Compl. ¶ 18.

A reasonable jury could find that any one of these acts contributed to a hostile work environment, triggering a systemic violation.  See Crowley v. L.L. Bean, 303 F. 3d 387, 395 (1st Cir. 2005).  As such, Diaz's hostile work environment claim is not time-barred.

In addition to her hostile work environment claim, however, Diaz alleges serial violations -- that she suffered disparate treatment with respect to the failure to give her raises and with respect to her termination.  There is no question that Diaz's claim concerning her discharge was filed within the statutory window.  Nor is there any question that the failure to give her a raise in 2006 is timely.  The only issue relates to her 2004 and 2005 raises and whether they are actionable under federal and Massachusetts law.  (Whether actionable or not, the failure to give her a raise in 2004 could still be evidence of discrimination.[13])  Her federal claims for

_____

[13] It should be noted that the defendant's argument seems to suggest that all of Mitesh's comments and behavior should be excluded from the overall discrimination analysis because they are time-barred.  The law, however, may determine that certain *events* of discrimination are not actionable because they are time barred, but may still be admissible as *evidence* of discrimination bearing on events that were actionable.  As I will explain below, his comments and attitudes -- to the extent that they are recognized as direct or circumstantial evidence of discrimination -- are relevant to show discriminatory animus or pretext as to the adverse employment decisions or hostile work environment during the statutory window.  See Small v. Mass. Inst. Tech., 584 F. Supp. 2d 284, 288 (D.

discrimination based on these denials are protected by the FPA, since she continued to receive pay checks until her termination, well within the statutory window. See Noel, 622 F.3d at 272 (discrimination claims in compensation accrue from the date of the last related paycheck).

To determine whether they qualify as serial violations under Massachusetts law, however, I must evaluate whether the denial of a raise in 2004 or 2005 somehow triggered an awareness and duty to assert her rights under the discrimination law, whether 2006 denial was "substantially related" to the allegedly untimely events, and whether that related event is discriminatory. Windross, 586 F.3d at 103. There is a triable question of fact as to whether Diaz was aware in 2004 that she was suffering age discrimination. Mr. Patel had only just begun his antics. The otherwise time-barred denials of a raise were surely related to the 2006 denial during the statutory period. Indeed, the most significant adverse employment event -- her termination -- occurred after October 11, 2005. That event is not time-barred and could constitute discrimination on its own.

Accordingly, summary judgment is **DENIED** on the grounds of the statute of limitations.

## B.     Evidence of Age Discrimination

Ms. Diaz alleges first that management's open discrimination created a hostile work environment; and second that she suffered adverse job actions, including, her termination, disparate discipline and denial of pay raises because of her age. The defendant argues that Ms. Diaz has not even alleged facts sufficient to make out a prima facie case of age discrimination;

---

Mass. 2008) (evidence before the statutory window begins "may nevertheless be considered to put the acts which form the basis of plaintiff's claim in context."). See also Morgan, 536 U.S. at 113 (an employee is not barred "from using . . . prior acts as background evidence in support of a timely claim").

and in the alternative, she has not demonstrated that the defendant's nondiscriminatory reasons or their conduct are pretextual.

### 1. Hostile Work Environment

A hostile work environment occurs where "the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993); Noviello v. City of Boston, 398 F.3d 76, 91 (1st Cir. 2005). A fact-finder must consider the totality of the circumstances, including the frequency of the conduct, severity, humiliation, and whether it unreasonably interfered with the plaintiff's work experience. Harris, 510 U.S. at 23. Indeed, the factfinder is to consider a broad range of conduct to assess whether the hostility was so severe or pervasive as to create an abusive work environment. Prescott v. Higgins, 538 F.3d 32, 35 (1st Cir. 2008); Landrau-Romero v. Banco Popular De Puerto Rico, 212 F.3d 607, 614 (1st Cir. 2000).

In the instant case, the inquiry raises questions of credibility and impression best left for a jury: Did Mitesh actually make the harsh comments about Diaz's age? If so, how often? Did he truly yell at her for any reason at any time? Are the witnesses who attest to similar comments by others credible? What did DePina mean when she told Diaz that old people should stay home? Did she make the statement at all? Is it true as alleged that management treated other older employees harshly? What was the effect of this environment on Diaz? Was it as extreme as she alleges? Did she really suffer in the workplace?

At this stage, Diaz's burden is to produce sufficient evidence to suggest that a reasonable fact-finder could find a hostile work environment, namely (a) that she is over 40 years old, and

(b) that she experienced harassment as a result of her age that was severe and pervasive, objectively and subjectively offensive.  See Prescott v. Higgins, 538 F.3d 32, 42 (1st Cir. 2008).  Both the First Circuit and the Supreme Court have appropriately urged courts to consider the evidence of a hostile work environment claim in its totality and to determine whether "when linked together, the seemingly disparate incidents may show a prolonged and compelling pattern of mistreatment that have forced a plaintiff to work under intolerable . . . conditions."  Cuddyer v. Stop & Shop Supermarket Co., 434 Mass. 521, 533 (2001).  See also O'Rourke v. City of Providence, 235 F.3d 713, 730 (1st Cir. 2001).

The depositions, affidavits, and documents that Diaz has produced at this stage are more than sufficient.  Although Diaz worked at the same hotel for twenty-two years, she was in her late fifties by the time of the alleged harassment.  She has presented evidence that management treated her differently than her younger colleagues in terms of general harassment, disparate discipline and denial of pay raises.  When she complained, they dismissed her complaint with no investigation, and the environment soured further.  They called her pejorative names, such as an "old hanky" and an "old bag."[9]  And they made similar comments about the company's employment policies.  When she hired another person over forty, she was told that she was turning the place into a nursing home.  Another manager told her that old people should stay

---

[9] The defendant argues that these are stray remarks and are not evidence of discrimination.  I will consider that argument in full below, but here I note that humiliating statements by peers or managers are among the factors to be considered in a hostile work environment claim.  See, e.g., O'Rourke, 235 F.3d at 729.  In fact, in my judgment, the "Stray Remarks Doctrine" is particularly inappropriate in the context of a hostile environment claim on summary judgment.  The plaintiff alleges that the remarks were subjectively offensive.  The court must then interpose its own values – determining that they were not so bad, after all, that a reasonable person in plaintiff's shoes would not have found them severe and pervasive.  While making judgments about "reasonableness" are not uncommon in summary judgment, this area is particularly fraught.  See, e.g., Sweezer v. Dep't of Corr., No.99-1644, 2000 WL 1175644, at *5 (6th Cir. 2000) (affirming the district court's summary judgment for the defendant in a race-based hostile environment case and noting that although "colored woman," "bitch," and "nigger" comments were improper, the comments were "brief and isolated, and are more indicative of a personality conflict than of racial animus.").

home. Despite excellent reviews and two awards of "Department Head of the Year," she suddenly was not reviewed and not given a raise. She alleges that she took a leave of absence for emotional reasons and saw a counselor.

Nor does she rely solely on her own experience. She also introduces testimony of other employees who confirm that Mitesh treated several older staff-members poorly and, worse, that management required at least one of them to sign false statements about Diaz. A reasonable jury could certainly determine that the totality of these circumstances created a severely abusive environment that affected Diaz's ability to do her work.

Summary judgment is therefore **DENIED** on the hostile work environment claim.

### 2. Disparate Treatment

Diaz further alleges that she suffered specific adverse employment decisions on account of her age when she was denied performance review, corresponding raises in 2004, 2005, and 2006 and then terminated. A plaintiff alleging age discrimination must eventually "prove, by a preponderance of the evidence, that age was the 'but-for' cause of the challenged adverse employment action." Gross v. FBL Financial Services, Inc., 129 S. Ct. 2343, 2352 (2009).[10] A plaintiff may do so with direct or circumstantial evidence. The Supreme Court has held explicitly that the ADEA requires no heightened standard for evidence of age discrimination:

> There is no heightened evidentiary requirement for ADEA
> plaintiffs to satisfy their burden of persuasion that age was the
> "but-for" cause of their employer's adverse action, see 29 U.S.C.

---

[10] The Supreme Court held that the mixed-motive analysis of Price-Waterhouse does not apply to age discrimination cases. Therefore the plaintiff has the burden to show that age was the single reason for the action. Gross, 129 S.Ct. at 2351. Under Massachusetts law, by contrast, a mixed-motive analysis may still be appropriate. Under that test, the plaintiff would bring "strong" evidence of animus so as to shift the burden of persuasion to the defendant to prove that it would have "taken the same action absent the unlawful motive." See Haddad v. Wal-mart Stores, Inc., 455 Mass. 91, 113 (2009). Under either test – federal or state – summary judgment is inappropriate.

> 623(a), and we will imply none. "Congress has been unequivocal
> when imposing heightened proof requirements" in other statutory
> contexts, including in other subsections within Title 29, when it
> has seen fit.

Gross, 129 S.Ct. at 2351 n.4 (quoting Desert Palace, Inc. v. Costa, 539 U.S. 90, 99 (2003), which

held that direct evidence was not required in mixed-motive cases).

Obviously, a plaintiff need not have direct evidence of discrimination to prevail on a

discrimination claim. Discrimination is rarely so blatant in a post-civil rights, post-ADEA

workplace. Rather, the framework for evaluating cases of circumstantial proof is, to a degree,

the burden shifting analysis of McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973).

At the first stage, the plaintiff presents a prima facie case of discrimination that (I) she belongs to

a protected class; (ii) she was performing at a competent level; and that (iii) she suffered an

adverse job action. Benoit v. Tech. Mfg. Corp., 331 F.3d 166, 173 (1st Cir. 2003). See also

Velez v. Thermo King de Puerto Rico, Inc., 585 F.3d 441, 447 (1st Cir. 2009) ("A plaintiff who

makes the prima facie showing is entitled to a presumption of age-based discrimination."). The

burden then shifts to the defendant to come forward with a non-discriminatory reason for its

decision. And finally, the plaintiff must prove that this non-discriminatory reason is merely

pretextual.[11] Of course the "ultimate burden of persuading the trier of fact that the defendant

intentionally discriminated against the plaintiff remains at all times with the plaintiff." Texas

Dep't Cmty. Affairs v. Burdine, 450 U.S. 248, 253 (1981).

---

[11] Though the Supreme Court has yet to decide the issue, the First Circuit has long applied this familiar burden-shifting framework to age discrimination cases. See Gross, 129 S.Ct. at 2349 n. 2 ("And the Court has not definitively decided whether the evidentiary framework of McDonnell Douglas . . . is appropriate in the ADEA context."); Velez, 585 F.3d at 447 n. 2 (noting that the First Circuit applies McDonnell Douglas to age discrimination).

While the <u>McDonnell Douglas</u> burden-shifting analysis was designed to protect plaintiffs from real but silent discrimination, the kind of discrimination that may only be proved by circumstantial evidence, the Court has recently emphasized that <u>McDonnell Douglas</u> is not meant to reduce the complex phenomenon of discrimination to overly simplistic tests. <u>See</u> <u>Reeves</u>, 530 U.S. at 151-53. (overturning the Fifth Circuit for failing to consider all of the evidence in the record in the last stage of the burden-shifting analysis and failing to draw all reasonable inferences in favor of the plaintiff). Indeed, the First Circuit has also said that at times, the court may put aside the <u>McDonnell Douglas</u> analysis to determine whether the evidence as a whole satisfies the relatively low threshold at summary judgment:

> On summary judgment, the need to order the presentation of proof is largely obviated, and a court may often dispense with strict attention to the burden-shifting framework, focusing instead on whether the evidence as a whole is sufficient to make out a question for a fact-finder as to pretext and discriminatory animus.

<u>Fennell v. First Step Designs, Ltd.</u>, 83 F.3d 526, 535 (1st Cir.1996). <u>See also</u> <u>Calero-Cerezo v. United States</u>, 355 F.3d 6, 26 (1st Cir. 2004).

The defendant alleges that Diaz has not brought sufficient evidence to make even a prima facie case for age discrimination, let alone show pretext. Mitesh's remarks and conduct and DePina's comments are merely "stray remarks" unrelated to her raises or eventual termination. Moreover, Jiten Hotel claims, Diaz brings no evidence to suggest that its non-discriminatory reasons for denying her a raise (i.e. the pay freeze) or terminating her (i.e. racist remarks) were pretextual. I disagree. This is one of those rare cases where the plaintiff has abundant direct evidence of discrimination. The animus is uncommonly blatant, and considered in context, the challenged remarks are not so *stray*.

### a. The "Stray Remarks Doctrine"

The "Stray Remarks Doctrine" arose out of Justice O'Connor's concurring opinion in

Price Waterhouse, in which she noted that "statements by non-decisionmakers, or statements by

decisionmakers unrelated to the decisional process itself" are not "*direct evidence*" of

discrimination for the purpose of a mixed-motive analysis. 490 U.S. at 277 (emphasis added).

Significantly, she did not say that such remarks were not evidence of discrimination at all, or not

ever probative of discriminatory animus. She simply noted that they were not *direct* evidence of

discrimination, in contrast to circumstantial evidence.

As I will explain below, this single statement in a concurring opinion birthed a progeny

of cases about "stray remarks" that extended far beyond the original holding. The so-called

"Stray Remark Doctrine" began as a debate about what comprised "direct evidence" in mixed-

motive cases (a test no longer required even in mixed motive cases) and then seeped into other

areas of discrimination law. Some courts, as described below, have gone so far as to suggest

that it is not a rule for analyzing the sufficiency of the evidence, but rather a rule to determine its

very admissibility at trial under Federal Rule of Evidence 403. The expansion of Justice

O'Connor's remarks in her concurring opinion is deeply troubling. In any event, in the instant

case, the defendant's remarks are not "stray" under the most stringent of tests.

### (1) The Origins of Stray Remarks: Mixed-Motive Analysis

In Price Waterhouse, Ann Hopkins, a senior manager employee, offered evidence at trial

of sexist oral and written comments made as she was considered for a partnership. 490 U.S. 228

(1989). As part of the process, partners were encouraged to submit written comments about

candidates, and in Hopkins' case, the comments suggested among other things that she was

"macho," "overcompensated for being a woman," and should "take a course at charm school."
Id. at 235. After reviewing these comments, they told her that they would place her candidacy on hold and that in the meantime, to improve her chances, she should "walk more femininely, talk more femininely, dress more femininely, wear make-up, have her hair styled, and wear jewelry." Id. In her concurring opinion, Justice O'Connor found that these comments plainly influenced the decision-making process -- and indeed were *part* of the decision-making process. They were sufficient, she found, to constitute the "direct evidence" required to shift the burden of persuasion to an employer to prove that it would have made the same decision had it not been motivated by sex.[12] By contrast, O'Connor noted, "stray remarks" -- remarks made by "non-decisionmakers or by decisionmakers not in the decisionmaking process" -- would not satisfy this "direct evidence" standard. Id. at 277 (O'Connor, J., concurring). In this context, Justice O'Connor was merely emphasizing the special weight of the comments made to the plaintiff.

In the years following Price Waterhouse, a body of law emerged as to when the discriminatory comments of decision-makers in the workplace satisfy the definition of direct evidence -- all in mixed motive cases. See, e.g., Fernandes v. Costa Bros. Masonry, Inc., 199 F.3d 572 (1st Cir. 1999). And the courts defined "stray remarks" using O'Connor's language: a remark was not "stray" if it was spoken by a decisionmaker and was sufficiently related to the employment decision. Id. at 581. But the standard was stretched even in this context. *Non-stray* remarks, or remarks that *are* central to the decisionmaking process, however, may still not qualify as "direct evidence" of discrimination if they are not clear enough for the reviewing court. The First Circuit in Fernandes, for instance, held that comments by a decision-maker that

---

[12] The mixed motive approach of Price Waterhouse was superceded by the 1991 Civil Rights Act. See 42 U.S.C. § 2000e-2(m). See also Desert Palace, Inc. v. Costa, 539 U.S. 90, 95 (2003).

pertain to the decisional process are not stray remarks, but nor are they direct evidence of discrimination unless they are "unambiguous." Id. at 583.

Nevertheless, nothing in these decisions suggest that the remarks were *not at all* probative of discrimination, just that they were not sufficiently clear to qualify for the then existing mixed motive direct evidence standard:  "[E]vidence is 'direct' (and thus justifies a mixed-motive jury instruction) when it consists of statements by a decisionmaker that directly reflect the alleged animus and bear squarely on the contested employment decision." Febres v. Challenger Caribbean Corp., 214 F.3d 57, 60 (1st Cir. 2000).  The First Circuit required statements that "give us a 'high degree of assurance' that [an adverse employment decision] was attributable to discrimination."  Patten v. Wal-Mart Stores East, Inc., 300 F.3d 21, 25 (1st Cir. 2002).  As courts identified the comments "stray" in these mixed-motive cases, they essentially held that the comments were insufficient evidence to shift the burden of persuasion to the employer under a mixed motive analysis.

### (2)      Stray Remarks and Pretext Analysis

In recent years, however, courts have extended the "Stray Remarks Doctrine" beyond mixed-motive cases, to the pretext analysis in McDonnell Douglas and beyond.  In Straughn v. Delta Air Lines, for example, the First Circuit characterized the stray remarks analysis as follows:

> Although statements directly related to the challenged employment action may be highly probative in the pretext inquiry . . . mere generalized "stray remarks," arguably probative of *bias* against a protected class, normally are not *probative of pretext* absent some discernible evidentiary basis for assessing their temporal and contextual relevance.

250 F.3d 23, 36 (1st Cir.2001) (internal citations omitted) (emphasis in original).  Remarks that are "arguably probative of bias," may now not be probative at all unless they were (a) related to the employment, (b) made close in time to the employment decision, (c) uttered by decisionmakers or those in position to influence the decisionmaker, and (d) unambiguous.  See Straughn, 250 F.3d at 36; Alvadaro-Santos v. Dep't of Health, 619 F.3d 126, 134 (1st Cir. 2010); Gonzalez v. El Dia, Inc., 304 F.3d 63, 69 (1st Cir. 2002) ("In the first place, 'stray workplace remarks,' as well as statements made either by nondecisionmakers or by decisionmakers not involved in the decisional process, normally are insufficient, standing alone, to establish either pretext or the requisite discriminatory animus."); Rivera-Aponte v. Restaurant Metropol #3, Inc., 338 F.3d 9, 12 (1st Cir. 2003) ("The lack of a direct connection between the words and the employment action significantly weakens their probative value."); Ortiz-Rivera v. Astra Zeneca, 363 Fed. Appx. 45, 47 (1st Cir. 2010) (finding "ambiguous" comments insufficient to prove discriminatory intent).  What this case law does is to elide mixed motive analysis – what is or is not direct evidence -- and pretext analysis.  McDonnell Douglas made no such distinction.  Pretext could be shown by direct or circumstantial evidence.

In any event,  the "ambiguity" analysis is particularly unsuited for summary judgment.  See Vesprini v. Shaw Indus., Inc., 221 F. Supp. 2d 44, 57 (D. Mass. 2002) ("Any statement from which a factfinder can take multiple inferences is arguably 'ambiguous.'  'Ambiguity' of that sort means the *defeat* of the defendants' motion for summary judgment.")  Whether a given remark is "ambiguous" -- whether it connotes discriminatory animus or it does not -- is precisely what a jury should resolve, considering all of the facts in context.  What may be ambiguous to me, the judge, may not be to the plaintiff or to her peers.

Diaz plainly demonstrates that her employer's proffered reasons to deny her raises and eventually to terminate her were pretextual. She offers comments by Mitesh and DePina in part to show that Jiten Management's claim that they denied her raises because of a pay freeze were pretextual as were their claims that they terminated her because of racist comments. In fact, she claims that their comments betrayed a discriminatory animus based on her age.

However characterized, whatever the test may be, the remarks offered here qualify. Mitesh's statements to Diaz were directly related to employment. He told her that she was getting old and asked when she was going to retire. When she hired a 52-year-old laundry attendant, he told her, "You're going to convert this hotel into a nursing home." He told Fazio, 31 years old at the time, that he would like to promote her to the Diaz's position because Diaz was getting old and he did not know if she could perform the job anymore. And they are unambiguous: Mitesh preferred that old people not work for him. They are also temporally relevant: the statements were made at the beginning of what seems to have been a long attempt to push Diaz out of her position. They reveal that management was already contemplating how to replace her -- three years before they finally managed to do so. It is true, as the defendant points out, that Mitesh transferred and Chet Patel assumed his position as manager. Nevertheless, Mitesh remained in a position to influence Chet Patel and indeed participated in Diaz's employment until the very end, contributing to the final "investigation." See Straughn, 250 F.3d at 36 ("The burden of persuasion on pretext may be met, *inter alia*, by showing that discriminatory comments were made by the key decisionmaker *or those in a position to influence the key decisionmaker*.") (internal quotations and citation omitted; emphasis in original). Mitesh's statements, therefore, are not "stray;" they are plainly probative of pretext.

Even after Mitesh left, the Director of Sales, DePina, told Diaz that "old people must remain home" and that management saw her as too old for the job. Like Mitesh, DePina was in a position of leadership to influence Chet or to articulate the sentiment of management as a whole. Indeed, DePina was directly involved in Diaz's termination; she wrote a report about Diaz and drafted at least one letter for another to sign. Her comment was made in the winter of 2006, around the time that Diaz was denied her last raise and shortly before she was fired. The statement was directly related to Diaz's employment and unambiguously discriminatory; management had determined that she was simply too old for her position. Her comment is not "stray" either according to the Doctrine.

It is not a surprise that the "Stray Remarks Doctrine" originally came out of the weakest discrimination cases, those in which some employee made a single remark that a judge deemed insufficient to show bias or pretext on the part of the employer. See, e.g., Gagne v. Nw. Nat'l Ins. Co., 881 F.2d 309, 314-16 (6th Cir.1989) (a single comment by a supervisor that he "needed younger blood" is insufficient to withstand summary judgment on age discrimination claim); Dungee v. Ne. Foods, Inc., 940 F. Supp. 682, 688 (D.N.J. 1996) (single comment that employer had hired a "young man" is too weak to raise inference of discrimination in hiring practice); Johnson v. J.C. Penney Co., Inc., 876 F. Supp. 135, 139 (N.D. Tex. 1995) (employer's single remark that plaintiff "should have been a preacher" after he led a prayer at a Christmas party is not sufficient evidence of racial pretext). Bad cases, as they say, often make bad law. Surely, there must come a point, however, when there are enough remarks, all along the same lines, that they can no longer be considered "stray" and analyzed in isolation, when they plainly offer a window into the way the decisionmaker or decisionmakers think. This is such a case.

### (3)     Stray Remarks after <u>Reeves</u>

In any case, I question the continuing relevance of the "Stray Remarks Doctrine" in light of the Supreme Court's recent holdings that require a more contextual view of discrimination.  In <u>Reeves</u>, the Supreme Court requires courts to consider *all* of the evidence in a discrimination case and warns judges not to "impermissibly substitute[] [our] judgment concerning the weight of the evidence for the jury's." <u>Reeves</u>, 530 U.S. at 153.  The <u>Reeves</u> court admonished the Fifth Circuit for dismissing comments made by a decision-maker as mere "stray remarks" because they weren't made in the specific context of the employment decision.  <u>Id.</u> at 152-53.  A reasonable jury could have inferred from those remarks -- made sometime beforehand -- that the decision-maker was motivated by animus when he actually made the decision.  The question of how probative the remarks were should have been reserved for the jury.

Indeed, in light of <u>Reeves</u>, the "Stray Remarks Doctrine" may be seen as impermissibly asking a court to weigh every statement to determine its probative value in isolation. Perhaps most troubling is the suggestion of some courts that discriminatory statements made in the workplace are *irrelevant* or even inadmissible as prejudicial.  Some Circuits have extended the "Stray Remarks Doctrine" to analysis under Rule 403 to determine whether a remark is more prejudicial than probative.  <u>See, e.g.</u>, <u>Henry v. Wyeth Pharm.</u>, 616 F.3d 134, 149-50 (2d Cir. 2010); <u>Morgan v. New York Life Ins. Co.</u>, 559 F.3d 425, 432 (6th Cir. 2009); <u>Joseph v. Publix Super Mkt., Inc.</u>, 151 Fed. Appx. 760, 769 (11th Cir. 2005).  The Second Circuit, for example, considers the same four factors now well-established under the Doctrine to determine admissibility: (I) whether the speaker is a decision-maker; (ii) whether the remark was made close in time to the adverse decision; (iii) whether the remark is ambiguous; and (iv) whether the

remark is related to the employment decision.  <u>Henry</u>, 616 F.3d at 1149.  While the <u>Henry</u> court cautioned that "none of these factors should be regarded as dispositive," <u>id.</u> at 150, the test nonetheless leads to the exclusion of most discriminatory comments that are made outside of the immediate decision-making context.

The use of racially, sexually, or ageist offensive language is necessarily prejudicial, precisely because it is highly probative.  What we say in the workplace may well reflect what motivates us, and could well affect how welcoming the environment is.  Introduced into evidence, ageist slurs, such as "old bag," "old shoe," or "old pumpkin" may lead a reasonable juror to conclude that the speaker harbors some animus towards a group of people, for example. And they might lead a reasonable juror to further conclude that when that speaker is making a decision concerning the employment of a member of the class about which he holds a bias, he might actually be influenced by that bias.  And finally, apart from the speaker's animus, the statements that employers and employees make in the workplace create an environment that may be hostile in itself or an environment in which discriminatory employment decisions are made and tolerated.

Courts understood this twenty years ago, when the issue was framed largely in terms of racist comments.  In <u>Mullen</u>, the Fourth Circuit stated, "Racial slurs represent the conscious evocation of those stereotypical assumptions that once laid claim to the sanction of our laws. Such language is symbolic of the very attitudes that the civil rights statutes are intended to eradicate."  <u>Mullen v. Princess Anne Volunteer Fire Co., Inc.</u>, 853 F.2d 1130 (4th Cir. 1988). Ageist comments and sexist comments should be similarly treated.  It may be that a single comment is made by a peer that is not reflective of the environment as a whole or of

management, but it is for the *jury* to determine -- in light of all the evidence before it -- that such a comment is "stray."  A jury cannot be asked to determine questions of bias and motivation without all of the evidence before it.

It should be noted, in any event, that the Supreme Court has moved away from the "direct evidence" analysis that birthed the Stray Remarks Doctrine.  In <u>Desert Palace</u>, the Court held that direct evidence is no longer required to invoke a mixed-motive analysis.  539 U.S. at 90.  The Court recognized that courts were parsing these forms of evidence in discrimination cases but not in any other type of case, even those in which there is a heightened evidentiary standard.  <u>Id.</u> at 100 ("[W]e have never questioned the sufficiency of circumstantial evidence in support of a criminal conviction, even though proof beyond a reasonable doubt is required.")[13]  Remarks are offered as circumstantial evidence of bias -- and circumstantial evidence may be "not only sufficient, but may also be more certain, satisfying and persuasive than direct evidence."  <u>Rogers v. Missouri Pac. R. Co.</u>, 352 U.S. 500, 508 n.17 (1957).

### b.      Sufficient evidence

In any event, in this case Diaz has brought abundant evidence to sustain her burden through a <u>McDonnell Douglas</u> burden-shifting analysis at summary judgment.  At the prima facie stage, Ms. Diaz met her very light burden: She is a member of a protected class; her awards show that her performance exceeded competency; and it is undisputed that she suffered adverse employment decisions when she was not given a raise in 2004, 2005, and 2006 and then terminated after years of excellent performance and promotions.

---

[13] The SJC has also moved away from the distinction and no longer requires direct evidence in mixed motive cases.  <u>See</u> <u>Haddad v. Wal-mart Stores, Inc.</u>, 455 Mass. 91, 114 (2009).

The defendant, in turn, has produced a non-discriminatory reason for the failure to give a raise: It had a pay freeze effective during that time period. And the defendant has suggested that it fired her for her own racist statements.

Ms. Diaz offers more than enough evidence to show that these reasons are pretextual. Indeed, the record suggests that the alleged freeze on raises is patently false. *Every single management employee other than Ms. Diaz received raises during the years of 2004-2006.* See Def. Answer and Doc. Resp. to Pl.'s Second Set of Interrog. 2 (document #70-8).[14] Likewise, testimony that Jiten management drafted false reports about Ms. Diaz and forced employees to sign them amply supports a finding that she was not fired as a result of any alleged racist comments. See, e.g., Suero Dep. 69-70, Dec. 15, 2008, Pl.'s Ex. 15 (Fellow employee testifies that Jiten manager Ms. DePina presented him with an untrue statement about Ms. Diaz for his signature).

Indeed, in this analysis, the statements of Mitesh and DePina are icing on the cake. The Supreme Court in Reeves, for example, found that a reasonable jury could infer animus on the sole basis that the employer's explanation for the employment practice was "unworthy of credence." Reeves, 530 U.S. at 147. The implication is that an employer who goes so far to lie about his reasons could well be masking an unlawful motive. In this case, a reasonable jury could surely find that the plaintiff was denied raises on account of her age where the employer gave a false reason for denying a pay raise, fabricated reports about the plaintiff, *and* where the plaintiff's direct manager called her an "old shoe," "old hankie" and "old pumpkin," told her that

_____

[14] In their Reply Brief, the defendant argues that Marcos Castillo did not receive a raise during this period, presumably because he received a raise on December 5, 2006, after Ms. Diaz was fired. In any case, his later raise -- and indeed the raises of every other manager -- tends to show that Jiten did not have a pay freeze in the years of 2004, 2005, or 2006.

she was turning the place into a "nursing home" when she hired a 52 year old, and repeatedly

told her that she was getting old and asked when she was going to retire, and where another

manager told her that "old people must remain home."  And of course a jury would also consider

the evidence that management generally treated other older employees harshly.[15]

Because Ms. Diaz has produced abundant evidence of animus to show disparate

treatment, summary judgment is **DENIED** on these claims as well.

## V.     <u>CONCLUSION</u>

For the reasons stated above, I **GRANT in part (with regard to Count V for**

**intentional infliction of emotional distress) and DENY in part (as to all other Counts)**

Defendant's Motion for Summary Judgment (document #63).

**SO ORDERED.**

**Date:  January 20, 2011**         */s/ Nancy Gertner*
                                       **NANCY GERTNER, U.S.D.J.**

---

[15] Indeed, such a strong case of animus may warrant a mixed motive jury instruction under Massachusetts law, an issue which I will reserve for trial.  The Supreme Judicial Court of Massachusetts has held that a mixed motive instruction is appropriate where a "plaintiff can demonstrate with a high degree of assurance that the employer's action was based on an illegitimate motive but the defendant posits a legitimate motive as well; a plaintiff can meet this burden by either direct or strong evidence."  <u>Haddad</u>, 455 Mass. at 114 (internal quotations and citation omitted).  That decision of law is best reserved for jury instructions, once all of the evidence has been presented to the court.  <u>See</u> <u>Price Waterhouse</u>, 490 U.S. at 279 (O'Connor, J., concurring).  Mixed-motive instructions are no longer appropriate under the ADEA after <u>Gross</u>.  <u>See</u> 129 S. Ct. at 2343.